UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

GENE HUSEN,

        Plaintiff,

                                         Case No. 03-10202-BC

v.                                     Honorable David M.  Lawson

DOW CHEMICAL COMPANY, UNITED
STEELWORKERS OF AMERICA and
UNITED STEELWORKERS OF AMERICA
LOCAL 12075,

        Defendants.

-and-                                <u>CONSOLIDATED CASES</u>

BRIAN ROPER,

        Plaintiff,

                                         Case No. 03-10203-BC

v.

DOW CHEMICAL COMPANY, UNITED
STEELWORKERS OF AMERICA and
UNITED STEELWORKERS OF AMERICA
LOCAL 12075,

        Defendants.
_____/

**<u>OPINION AND ORDER GRANTING</u>**
**<u>DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT</u>**

In the first half of the year 2000, defendant Dow Chemical learned that some of its many
employees were misusing company computers with respect to Internet access and sending personal
email messages with objectionable content.  The ensuing investigation resulted in the termination
of some of those employees, including plaintiffs Gene Husen and Brian Roper.  They have filed a
so-called "hybrid" action under section 301 of the Labor Management Relations Act, 29 U.S.C. §

185 (LMRA), alleging that their terminations and the procedures that led to them violated the collective bargaining agreement that was in place, and their union, defendants United Steelworkers of America and its Local 12075, failed to fairly represent them through the process. The defendants each have moved for summary judgment, and the Court heard oral argument on the motions on August 12, 2004. The Court now finds that the plaintiffs have not brought forth evidence to establish that Dow breached the CBA or that the Union acted arbitrarily, discriminatorily, or with bad faith. The Court, therefore, will grant the motions for summary judgment and dismiss the case.

I.

According to the defendants' declarations filed in support of the motions, defendant Dow Chemical Company manufactures chemicals and related products and has a large manufacturing complex located in Midland, Michigan. In 2000, Dow employed approximately 2,700 employees at its Midland facility. Approximately 1,550 of those employees, including plaintiffs Brian Roper and Gene Husen, were represented by United Steelworkers of America, Local 12075. Dow and the Union were parties to a collective bargaining agreement.

In May of 2000, after receiving a complaint about inappropriate email material at its Midland facility, Dow decided to conduct a search of all of its employees' email accounts. Dow's investigation utilized backup tapes that capture a "snapshot" of all employee email accounts as they existed on May 8, 2000. This snapshot captured all emails sent or received on that date and all stored email messages going back indefinitely that were stored as of that date.

As a result of its investigation, Dow discovered that some 330 employees, or twelve percent of its local workforce, were violating company email policies through the reception and transmission of sexually explicit emails and other emails of an inappropriate nature. Dow had widely published

-2-

its policies outlining proper Internet usage: an Internet usage policy, a corporate policy on computer systems, a telecommunications security warning, and various corporate communications known as "Newslines," all of which explained that the use or sending of files that were inappropriate or sexual in nature would lead to discipline and possibly termination.

Due to the large number of offenders and the severity of the situation, Dow created what it describes as a "multi-factored system" by which to examine each offending employee's misconduct in order to reach a conclusion as to what disciplinary action would be most appropriate. Dow Mot. Summ. J. Debenham Decl. at ¶ 35.  This assessment was based upon three criteria: (1) the inappropriateness of the email; (2) whether and how often the employee sent or received the email; and (3) the employee's prior work record.  The first criterion measured the "inappropriateness" of the email by dividing emails into three categories as follows:

Category 1:     Non-offensive material which occupies a large amount of disk space
Pictures of scantily clad women; and
Pictures of individuals in suggestive or compromising positions

Category 2:     Pictures or videos containing full or partial nudity;
Pictures or videos which contain graphic violence or grotesque images; and
Cartoon depictions referencing sexual acts

Category 3      Pornographic pictures of videos which depict sexual acts or deviant behavior

*Id.* at ¶ 39.

The second disciplinary criterion assigned a number of points based on how often the offending employee had sent inappropriate emails to others, taking into account the number of people it was sent to, whether or not it was sent to people within Dow or outside of the company,

and the category in which the email had been grouped in the first criterion.  The following is the "Worksheet" used by Dow to calculate points under the second criterion:

| Calculation Used to Determine The Level of Discipline |
| :---: |

For Each Email, Calculate the following:

| Category | | Number of People | In/Out Dow | | |
| :--- | :---: | :--- | :---: | :---: | :--- |
| 2 or 3 | X | (Sent to Dow) | X | 1 | =_____ |
| 2 or 3 | X | (Sent to People outside of Dow) | X | 1/5 | =_____ |
| | | | | *Total Points* | =_____ |

| Total Points | Action |
| :--- | :--- |
| 0-35 | 2 -3 Week Suspension with Last Chance Agreement |
| 43-113.5 | 4 Week Suspension with Last Chance Agreement or Termination of Employment |
| 137.5 - 1135 | Termination of Employment |

Pl.'s Resp. Br. Ex. 6; Compl. Ex. 1.  The plaintiffs argue that this worksheet was the only method permitted by the collective bargaining agreement by which Dow could terminate employees for misuse of the company's email system.  Dow on the other hand argues that this worksheet was only used to provide assistance to Dow personnel in determining the severity of the emails circulated by Dow employees and that Dow always planned on factoring past employee discipline into the mix in deciding whom would be terminated and whom would be suspended.

Lastly, the third criterion examined the offending employee's prior work record under Dow's "Managing Poor Performance Process," which permitted immediate termination for serious or major

-4-

violations or offenses. The email violations in question by the plaintiffs were considered by Dow to be a major offense.

Because this inquest led Dow to the finding that hundreds of employees had sent or saved email deemed Category 2 or Category 3, Dow dealt with offenders in phases. Phase I focused on the most serious offenders, which included those individuals who had sent Category 2 or 3 emails and who previously had received either a written warning or a more severe form of discipline. In Phase I, twenty-four employees were terminated. All employees exceeding a point total of 113.5 under the formula were terminated, while those with point totals ranging from 0 to 113.5 were either terminated or suspended for two to four weeks and subsequently given the opportunity to return to Dow upon signing a "last chance agreement." The last chance agreement put the employee on probation and stated that during that time the employee would be represented by the Union only in matters of wages, hours, and working conditions, not for matters of discharge. In Phase I, thirty-nine employees signed last chance agreements, none of whom were terminated during the course of their periods of probation.

### Plaintiff Gene Husen

Gene Husen was at the time of the investigation employed by Dow as a head operator alternate in Dow's ion exchange copolymer department. Husen monitored the chemical-making process through computer equipment and worked with the chemicals styrene, divinylbenzene 55, and iso-octane. Prior to the email incidents, Husen's record exhibited performance problems in the workplace on several occasions. On August 8, 1997, a female co-worker claimed that Husen had "yelled at her and behaved in an aggressive manner," an incident for which Husen was written up by his supervisor Robert Smith. Dow Mot. Summ. J. Ex. E1, Husen Dep. at 51-52; Ex. G. On

December 10, 1997, another supervisor, James Witer, sent Husen an email warning that described how a chemical spill had resulted from Husen's poor performance.  A copy of this email was put into his personnel file.  On February 17, 1998, Husen was issued a documented verbal warning by supervisor Robert Smith based on his failure to wear proper safety equipment and his misuse of tools.  No grievance was filed by Husen regarding this discipline.  Husen then received a written warning on March 13, 1998 from supervisor James Witer when he oversaw the packaging of a chemical product into an incorrect container, resulting in the loss of that chemical batch.  The warning, which was also not grieved by Husen, stated that further failure to abide by company policies and rules would "result in further disciplinary action up to and including discharge."  Husen Dep. at 48-49; Ex. G.  According to Dow, "Husen admitted at his deposition that the 'documented verbal warning' placed him in Step 1 of the progressive disciplinary process, and the 'written warning' placed him at Step 2." Husen Dep. at 136-37; *see* Dow Ex. 18 (Progressive Discipline Process).

Husen was found to have sent emails depicting the following images:

1. a cartoon of Popeye and Olive Oil engaged in sexual intercourse
2. a cartoon Mickey Mouse with his nose in a woman's anus
3. Tweety bird with a nude woman
4, a man whose genitalia was exposed
5. a woman's breasts
6. a cartoon of male genitalia dressed up
7. a nude woman with her legs spread open

Dow Mot. Summ. J. Ex. G; Husen Dep. at 150-57.

Husen also admitted to receiving and sending emails of a sexual nature, including "an old man at Mardi Gras and he was flashing" to people within the plant and people outside the plant, as well as "a woman showing her breasts" to Bill Salisbury, a co-worker. Husen also admitted that

-6-

several sexual cartoons were sent from his computer, though he did not believe it was he who had sent them. Husen Dep. at 40-47. Husen was deemed to be a serious offender and was thus evaluated in Phase I. Based upon the three criteria employed by Dow, the emails alone would have led to suspension followed by a last chance agreement for Husen, but, in light of his past disciplines, Dow believed it had cause to terminate his employment. As a result of these findings, Dow allotted Husen 22 points for his email violations and determined that, in conjunction with his past incidents of poor performance, termination was warranted. His termination was effective as of July 19, 2000.

On October 1, 2001, Dow met with the Union for a step-3 grievance hearing regarding Husen's termination. At the hearing, Dow detailed the reasons for terminating Husen, citing his prior work record. Subsequently, Dow denied the Union's grievance on November 16, 2001, stating that "the previous progressive discipline combined with the sending of pornography by email was just cause for termination of employment." Debenham Decl. at ¶ 67, Ex. 22.

### Plaintiff Brian Roper

Brian Roper was a head operator in the Garlon DBMOA facility and supervised a chemical "process." He was responsible for plant safety, including the safety of employees making chemicals. He was found to have had one Category 3 email sent from his email account to that of a Dow co-worker. Roper claimed that he tried to send the email himself, failed, and finally allowed Jeff Holingshead, a co-worker, to send an email depicting a woman performing oral sex on a horse. Because he had no prior disciplinary record with Dow and because his violation was so limited, Roper was suspended for two weeks for his misuse of the company email system and would have been allowed to return to work upon signing a last chance agreement, which stipulated that Roper would be considered "on probation" for the next twenty-four months and represented by the Union

in matters of wages, hours, and working conditions only.  The agreement apparently meant that the employee would forego union representation for matters of discharge under the last chance agreement, giving Dow the right to make all decisions relating to termination for the probationary period.

Roper was among a group of three employees who declined to sign the last chance agreement when it was offered to them.  Consequently, he was fired, but he retained the right to have the Union grieve the termination in accordance with the CBA.  As it turns out, of the thirty-nine employees in Phase I who signed last chance agreements, none were terminated during the course of their periods of probation.

### Post-termination Union activities

Following the terminations, defendant United Steelworkers filed grievances on behalf of all terminated bargaining unit members, including the plaintiffs, on August 29, 2000.  Throughout 2001, Dow and the Union met for what are known as "step-3 hearings," whereby the Union and Dow presented witnesses, other evidence, and arguments regarding each employee's wrongdoings. Dow's labor relations manager, Darrel Debenham heard the evidence along with a panel of Dow representatives, none of whom had been involved in either Dow's investigation or the disciplinary process, in an attempt to resolve each grievance.  Those grievances that were not resolved at the hearings were candidates for arbitration under the CBA.

According to 12075's former president William Laney Jr., the local union membership had a mixed experience with last chance agreements signed with Dow: some employees kept their jobs and some members eventually were fired.  As such, Laney warned Roper about the agreement's dangers, which included the possible loss of the option of the CBA's grievance procedure for two

-8-

years.  Roper alleges that he was told that Dow "couldn't make it stick," and so he refused to sign his agreement and was fired on July 25, 2000.  Dow Mot. Summ. J. Ex. C, Roper Dep. at 66-68, 74, 98; Ex. 3.  Roper admitted that the decision to forego probation was his own, he knew he might lose at arbitration, and Laney did not encourage Roper to challenge the suspension or the probationary offer.

On January 3, 2001, Roper and representatives from the Union met with representatives from Dow for a step-3 hearing at which Dow explained its reasoning behind Roper's discharge.  Roper disputed the allegation that he sent the offending email.  As a result, on February 2, 2001, Dow rewrote Roper's discipline conditions so that his statement denying that he was the sender of the email was included, along with his acknowledgment that he had allowed someone else to use his company email account for an inappropriate purpose.  However, because the revised offer of discipline also contained a last chance agreement and would involve Roper relocating to a new building at Dow, he again refused to sign.

At some point following April 1, 2002, Harry Lester, the Union's director of District II, learned that the operating engineers in Dow's Freeport, Texas plant had won their case involving a similar email-related disciplinary dispute through arbitration, so the Union retained an attorney from the law firm that had represented the Operating Engineers in the Texas arbitration.  Dow did not agree to arbitrate all the cases in one hearing.  In late August of 2002, Dow and the Union began the arbitration for Union member Terry Snyder, who had received 56 points under Dow's discipline schedule and had no record of prior discipline.  The arbitrator was Richard Mittenhal.  The Union presented four main arguments as to why Snyder's discipline should be set aside.  First, the Union claimed that Dow had failed to explain to Snyder what the company considered inappropriate email

or the potential consequences of sending improper emails. Second, the Union alleged that members of Dow's management were involved in or condoned misuse of the email system. Third, Dow's disciplinary system was, according to the Union, "arbitrary and capricious." And last, the Union claimed that Dow had violated its own progressive discipline policy when it applied the discipline in this case.

On October 17 and 18, 2002, Randolph Stoike's case was arbitrated by Dow and the Union before Arbitrator Richard Block. The Union made the same arguments it had used at Snyder's arbitration, adding in Stoike's case that he had worked at Dow for twenty-four years and the email discipline was the first discipline he ever had received in the course of his career at Dow.

On October 18, 2002, Arbitrator Mittenthal rendered his decision. He affirmed the legitimacy of Dow's disciplinary system, as well as the fairness of its application to Snyder, stating that Dow clearly had warned that it "will not tolerate such things as sexual harassment or utilizing email to view or pass along inappropriate material" and the sanction for violating that policy would be "up to and including discharge." Union Mot. Summ. J. Ex. 2, Lester Aff. at ¶¶ 11, 12; Lester Aff. Ex. B, pp. 8-16. Arbitrator Mittenthal also said that there was no evidence to suggest that management was aware of the policy violations or that they failed to enforce the policy, and that the argument that discipline was enforced in an arbitrary or capricious manner "plainly lacked merit." He rejected the idea that Dow had condoned the email policy violations, and he discounted Snyder's argument that he had not violated a rule as an employee previously because "these transmissions of filth occurred over a lengthy period of time notwithstanding the prohibitions found in Dow policies." Lester Aff. at Ex. B, pp. 11-15.

Kenneth Lesh was the next employee to challenge his termination at arbitration. Lesh was given 103 points for sending pornographic emails and had a prior documented verbal warning on his record. His case was heard by Arbitrator Nicholas Zumas. Arbitrator Zumas rendered a decision on January 28, 2003 denying Lesh's grievance; he thoroughly reviewed the opinion of Arbitrator Mittenthal and found it to be "authoritative, and of binding application to the instant case." Lester Aff. at Ex. C, pp. 16-18. Arbitrator Zumas denied the grievance on the grounds recited in the Snyder arbitration decision.

On December 11, 2002, Roper's arbitration began. However, Dow had not yet finished presenting its case when the time scheduled before Arbitrator Witt expired, at which point Roper told Local 12075 president Kent Holsing that he would accept any offer from Dow, even reinstatement. Holsing communicated this offer to Darrel Debenham, the human resources manager at the facility where Roper had been employed, but Debenham never responded.

In late January 2003, Harry Lester, United Steelworkers District 2 director, decided after reading the Lesh grievance decision that continuing the arbitration process would most likely prove unsuccessful, so Lester began to discuss a global settlement with Dow, which he believed would be the best result for most of the members. Dow offered each employee $8,000 but did not offer any employee the option of reinstatement. Lester personally did not know the remaining discharged employees, but based on his belief that further arbitrations would be futile, he concluded that a cash settlement would be more acceptable to the members than a frank denial of their claims at arbitration. On Friday, February 7, 2003, Local 12075 president Holsing acting on Lester's behalf accepted Dow's settlement offer awarding $8,000 to each discharged employee who signed a release. Dan Nadolski, staff representative for the Union, was one of the Union officials involved

-11-

in negotiating the settlement agreement.  He reviewed the Snyder and Lesh arbitration decisions and had attended several arbitration hearings.  He said that he was influenced by that information, which was a factor in his analysis.

However, on February 3, 2003, Arbitrator Block rendered his decision in the Stoike arbitration.  He upheld Dow's disciplinary system, but reinstated Stoike under a last chance agreement and without backpay, noting that Stoike's work record had been clear for twenty-four years before the offending emails were sent.  Dow refused to reinstate Stoike, claiming that Stoike was covered under the global settlement because his discharge was outstanding at the time the agreement was reached. Lester was notified of the decision on February 7, 2003, but he recognized the decision as a pyrrhic victory because no back pay was ordered and the company did not reinstate Stoike, whose case was settled later without reinstatement.

The Union sent a letter on March 4, 2003 informing discharged employees of the global settlement, and on March 10, 2003 Union leadership held a meeting to explain the settlement further. At first, both Husen and Roper signed the release, which enabled them to collect the settlement funds; but they both later revoked their releases and filed this lawsuit on August 29, 2003.

## II.

A motion for summary judgment under Federal Rule of Civil Procedure 56 presumes the absence of a genuine issue of material fact for trial.  The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural

-12-

shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Ctr. v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Thus a factual dispute that "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment that is properly supported. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir. 1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). In this case, the plaintiffs attack the defendants' presentation of their motions for summary judgment on the ground that the supporting declarations

-13-

are not notarized or submitted under oath and therefore are not "affidavits"; Rule 56(e) refers to

"affidavits." That argument, however, ignores the plain language of 28 U.S.C. § 1746, which states:

> Wherever, under any law of the United States . . . any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated.

A document executed under the penalty of perjury has "the same force and effect as an affidavit"

for evidentiary purposes. *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992) (citing 28 U.S.C.

§ 1746). The defendants' declarations in this case were executed "under the penalty of perjury."

Therefore, they are sufficient in form to support a summary judgment motion. *Sterling China Co.*

*v. Glass, Molders, Pottery, Plastics & Allied Workers Local No. 24*, 357 F.3d 546, 557 n.1 (6th Cir.

2004) (holding that declarations executed in accordance with 28 U.S.C. § 1746 may be submitted

to support motions filed under Rule 56).

When, as here, the party bringing the summary judgment motion has met its initial burden,

the party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve

the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence

in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

A party opposing a motion for summary judgment must designate specific facts in affidavits,

depositions, or other factual material showing "evidence on which the jury could reasonably find

for the plaintiff." *Anderson,* 477 U.S. at 252. If the non-moving party, after sufficient opportunity

for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper.

*Celotex Corp.*, 477 U.S. at 322-23.

-14-

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). The Court is mindful that "[i]n evaluating the evidence, [the court must] 'draw all reasonable inferences therefrom in a light most favorable to the non-moving party.'" *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

The parties agree that the CBA in this case calls for all employer-employee disputes to be decided by the grievance process, which is the employee's exclusive remedy against the employer. According to the CBA, the process begins with informal discussions and concludes with arbitration. An employee has no right to sue his employer directly if the bargained-for process has been followed faithfully. Thus, in order to recover in a hybrid suit under Section 301 of the LMRA the plaintiff must show that Dow breached the CBA *and* the Union breached its duty of fair representation. *Bagsby v. Lewis Bros., Inc.,* 820 F.2d 799, 801 (6th Cir. 1987); *see Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558 (1990); *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 163-65 (1983); *White v. Anchor Motor Freight, Inc.*, 899 F.2d 555 (6th Cir. 1990). "Unless the employees 'demonstrate[ ] both violations, [they] cannot succeed against either party.'" *Higgins v. International Union, Security, Police, Fire Professionals of America (SPFPA)*, 398 F.3d 384, 387 (6th Cir. 2005) (quoting *Bagsby*, 820 F.2d at 801); *see also Black v. Ryder/P.I.E. Nationwide, Inc.*, 930 F.2d 505, 510 (6th Cir. 1991) (stating that "[i]n any event, when the union cannot be held liable for unfair representation, of course, the employer cannot be held liable for breach of the collective bargaining agreement").

-15-

"The 'interdependency' of a union employee's claims against his employer for breach of a collective bargaining agreement and against his union for breach of its duty of fair representation is well-established in this Circuit." *Millner v. DTE Energy Co.*, 285 F.Supp. 2d 950, 960-61 (E.D. Mich. 2003); *see also White v. Anchor Motor Freight, Inc.,* 899 F.2d 555, 559 (6th Cir.1990) (observing that "if the first claim anchored in the employer's alleged breach of the collective bargaining agreement fails, then the breach of duty of fair representation claim against the union must necessarily fail with it"); *Lucas v. Leaseway Multi Transp. Serv., Inc.*, 738 F. Supp. 214, 220 (E.D. Mich. 1990), *aff'd*, 929 F.2d 701 (6th Cir. 1991) (noting that "[s]ince plaintiff's count as to the duty of fair representation fails, plaintiff's other count alleging a breach of the CBA also must fail").

In this case, both the Union and Dow argue that they are entitled to summary judgment on the plaintiffs' claims against each of them.

## A.

Plaintiff Husen contends that Dow breached the CBA when it fired him because his worksheet point total did not place him in the termination category according to Dow's schedule, and his prior record of discipline should not have been considered because of a provision in the CBA that calls for expungement of past discipline after the lapse of one year.  Roper argues that forcing the last chance agreement on him violated the CBA because it relegated him to probation status, which is reserved in the CBA for "newly hired employees," that is, those employees employed less than one year, and may last only twelve months, not the twenty-four months called for in the last chance agreement.

-16-

These arguments, however, ignore the obvious and undisputed fact that both employees committed offenses that were deemed "major/serious" under Dow's progressive discipline policy and subjected them to termination. The parties do not dispute that Dow has the right under the CBA to promulgate and enforce reasonable work rules. The CBA specifically reserves to the company "the right to hire, to promote of demote, and the right to release employees for due cause." Lester Aff. at Ex. A, p. 87. Dow had widely disseminated its policies regarding email usage at work and specifically and clearly informed its employees that it was inappropriate to send sexually explicit email at work. Dow's Internet Usage Policy stated that "users will not knowingly . . . send or download mail or other communications, files or programs containing potentially offensive, or harassing material, particularly relative to . . . sex. . . . Violations of the Internet Usage Policy may result in disciplinary action, up to and including termination of employment." Debenham Decl., Ex. 9. Dow's Corporate Policy on Computer Systems and Telecommunications Security warned employees that they could be terminated for using computer files that contained "obscene, offensive, and harassing material." Debenham Decl., Ex. 10. Dow reiterated these warnings in publications posted on Dow's Intranet and in its "Newslines" periodically published to its Midland employees. According to Dow, there even was a notice posted in the union hall that warned that sending or sharing inappropriate email could result in employees being "busted." Debenham Decl. ¶ 30 & Ex. 17.

Under Dow's progressive discipline policy, the commission of a "serious/major offense" could subject the employee to either step-2 discipline (written warning) or step-4 discipline (termination). Debenham Decl., Ex. 18. Husen does not dispute that sexually explicit emails constitute a serious offense for which he could be terminated. He does suggest, however, that Dow

-17-

somehow modified its policy by adopting as a "policy" the schedule outlined on the worksheet, under which he accumulated only twenty-two points, which was short of the forty-three required for termination. That argument is untenable, however, because the undisputed evidence confirms that Dow used the worksheet as a tool to address a problem with computer abuse that was serious and pervasive. The worksheet was a device that Dow employed to gage the extent of violations by a host of employees and explain its actions to the Union in a rational way. There is no record evidence to suggest that Dow intended the worksheet as a modification of its progressive discipline policy.

Husen points to the deposition of Ronald Rippee, an employee who was terminated from Dow but later reinstated, as proof that Dow originally relied exclusively on the point totals in the worksheet to determine which employees would be terminated, and that Dow later changed its mind and decided to use prior discipline as an added basis to justify termination. *See* Pl.'s Resp Br. Ex. 7, Rippee Dep. at 26 (testifying that termination was at first an "email issue" and then later turned into a "discipline issue"). Although Rippee's deposition does not provide clear evidence that this was the case, even if Dow did not consider past discipline initially when terminating employees for improper email usage, it had the right to do so based on its well-established progressive discipline policy.

Nor does Husen's argument that his discipline record was off limits find support in the contract documents, work rules, or other record evidence in this case. Husen relies on language in the CBA that describes a "satisfactory work record," a term used in the determination of seniority in Article II of the CBA. "Having a satisfactory work record is a necessary condition for advancement and job mobility." Dow's Mot. Summ. J. Ex. 1, CBA at 33. If the employee's performance results in the loss of that status, then advancement may not occur. The chart at

Appendix F of the CBA explains that Dow will return an employee to having a "satisfactory work record" if the employee has performed satisfactorily for six to twelve months after having an "unsatisfactory" work record. *Id*. at 125-126. However, there is nothing in the CBA or other work rules that ties this concept to the progressive discipline policy.

It is undisputed that Husen's disciplinary record at Dow was not exemplary. In fact, Husen's 1998 written warning placed him at step 2 of the progressive discipline policy and subjected him to termination for a subsequent serious offense, which he acknowledges having committed. The record indicates that the Union understood that discipline extending back for at least three years was in play under the progressive discipline policy. Union Vice President Rockford Chase testified at his deposition that if an employee received discipline in June of a given year, Dow could consider that discipline in making employment decisions for up to three years measured from the preceding January. Therefore, discipline that occurred in January 1998 could be considered for almost four years by Dow. The termination of Gene Husen in this case did not violate the CBA.

Plaintiff Roper likewise does not contest that improper email use constituted a serious offense for which he could be terminated. Rather, he says that the disciplinary remedy that included the last chance agreement contravened the probation terms of the CBA. That argument, however, fails to account for the obvious and undisputed agreement between the Union and Dow to allow the last chance agreements to go forward in lieu of termination in certain well-delineated cases. "It is clear that an employer and a union may voluntarily agree to modify or amend their collective bargaining agreement." *In re U.S. Truck Co., Inc.*, 74 B.R. 515, 528 (Bankr. E.D. Mich. 1987). Where the Union and the employer agree to disciplinary measures that avoid the loss of employment for Union members, the conditions bargained for become a new provision that governs the

-19-

employer-employee relationship. *See Chrysler Workers Ass'n v. Chrysler Corp.*, 834 F.2d 573, 575 (6th Cir. 1987) (describing letter agreements that modified a CBA). Although the CBA stated that neither party to the agreement may reopen "negotiations on any issue either economic or noneconomic," CBA at 103, there is no limitation against the parties modifying their agreement by mutual assent, nor is there a method-of-modification clause that restricts the manner of amending the CBA. *See Spero Elec. Corp. v. Intern'l Broth. of Elec. Workers*, 439 F.3d 324, 330 (6th Cir. 2006). Moreover, the negotiations that led to the settlement that included the use of last chance agreements is consistent with the grievance procedures outlined in Article III of the CBA, which prescribe early-stage negotiations as a preferred manner of resolution of labor disputes. The CBA states that "[a]greements, not in conflict with the provisions of the [CBA], reached in any of the above mentioned steps, shall be binding on the Company, the aggrieved employee, and the Union." CBA at 39. As mentioned, thirty-nine employees, all represented by the Union, agreed to the terms of the last chance agreement. Even if the 24-month probation term of the last chance agreement enlarged the term of probation in the CBA for new workers, the Union and Dow agreed to the 24-month probation term as a settlement to avoid the loss of jobs by employees whose transgressions of work rules was "serious" of "major."

The Court concludes, therefore, that the undisputed facts do not disclose a breach of the CBA.

### B.

The plaintiffs' argument that the Union breached its duty of fair representation fairs no better. Husen insists that the Union should have pursued his grievance through arbitration, especially because Local 12075 president Laney supposedly told him that he had a good chance of

-20-

winning.  He says the Union breached its duty further when it intentionally replaced Laney by promoting him to the Union's International office so that the Union could get somebody else in there that was more accepting of Dow's demands.  He contends that a fact issue arises from evidence that suggests that the Union made the decision to abandon arbitration well before the two negative arbitral awards were handed down.

Roper repeats these arguments and also contends he received bad advice from Laney, who counseled him not to sign the last chance agreement.  He also believes that that his arbitration would have been different than the Snyder and Lesh arbitrations because Roper would have challenged the validity of the last chance agreements, and the arbitrators in the other two cases did not rule on the validity of the agreements.  Roper also argues that during the grievance process with Dow, Dow made an offer of compromise to him that was never communicated to him by Union members.  He contends that the Union acted improperly by refusing to consult with him about the negotiated settlement of $8,000.  Finally, Roper alleges that instead of answering his questions about the settlement, union officials told him he was no longer welcome at the union hall and that he should get a lawyer.

These arguments, however, do not suggest that the Union's conduct with respect to the email disciplinary saga in general, or with respect to these two union members, was arbitrary, discriminatory, or in bad faith, and the Court finds no evidence to establish those facts.  In *Vaca v. Sipes*, 386 U.S. 171, 190 (1967), the Supreme Court stated that "[a] breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining agreement is arbitrary, discriminatory or in bad faith."  386 U.S. at 190.  "Each of these wrongs is mutually independent, meaning, that 'the three named factors are three separate and distinct possible

routes by which a union may be found to have breached its duty.'" *Garrison v. Cassens Transp. Co.*, 334 F.3d 528 (6th Cir. 2003) (quoting *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 584 (6th Cir. 1994). A union's conduct is "arbitrary" "only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *Air Line Pilots Association, Inter'l v. O'Neill*, 499 U.S. 65, 67 (1991) (citation omitted). Thus, conduct that might amount to negligence or poor judgment will not violate the prohibition against arbitrary conduct. *See United Steelworkers of Am. v. Rawson*, 495 U.S. 362, 372-73 (1990). Likewise, although the union's duty includes undertaking a "reasonable investigation," *Black*, 15 F.3d at 585, that duty "does not require [the] union to exhaust every theoretically available procedure simply on the demand of a union member." *St. Clair v. Local Union No. 515, Int'l Bhd. of Teamsters*, 422 F.2d 128, 130 (6th Cir. 1969) (internal citations omitted). "A union may breach its duty, however, if it processes a grievance in a perfunctory manner." *LaCortiglia v. Aluminum Co. of Am.*, 976 F. Supp. 707, 711 (N.D. Ohio 1997) (citing *Milstead v. Inter'l Bhd. of Teamsters*, 580 F.2d 232, 235 (6th Cir. 1978)).

"Judging whether a union has acted discriminatorily or in bad faith ordinarily presents a simple and straightforward issue." *Black*, 15 F.3d at 584. The plaintiffs do not contend that the Union discriminated against them, nor does the record suggest any classification within which the plaintiffs might have been grouped for the purpose of disparate treatment. "Bad faith" has been characterized as union actions lacking "complete good faith and honesty of purpose in the exercise of its discretion." *Apperson v. Fleet Carrier Corp.*, 879 F.2d 1344, 1355 (6th Cir. 1989) (quoting *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 564 (1976)). Despite the plaintiffs' protestations, they have not come forward with the requisite proof to show that the Union's actions

were motivated by personal animus or lacked good faith and honesty in dealing with them. Their suggestion that the promotion of the Local president is based entirely on speculation; there is no evidence in the record, either direct or inferential, that supports that argument.

The Supreme Court has held that an employee must come forth with "substantial evidence" proving that his union breached its duty of fair representation. *See Motor Coach Employees v. Lockridge*, 403 U.S. 274, 299 (1971). Evidence that a union chose not to proceed with a grievance through arbitration alone will not suffice, since the Court, as a matter of public policy, affords great deference to the union's decision to abandon a grievance it deems meritless.

> In providing for a grievance and arbitration procedure which gives the union discretion to supervise the grievance machinery and to invoke arbitration, the employer and the union contemplate that each will endeavor in good faith to settle grievances short of arbitration. Through this settlement process frivolous grievances are ended prior to the most costly and time-consuming step in the grievance procedures. Moreover, both sides are assured that similar complaints will be treated consistently, and major problem areas in the interpretation of the collective bargaining contract can be isolated and perhaps resolved. And finally, the settlement process furthers the interest of the union as statutory agent and as coauthor of the bargaining agreement in representing the employees in the enforcement of that agreement.
>
> If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation. Moreover, under such a rule, a significantly greater number of grievance would proceed to arbitration. This would greatly increase the cost of the grievance machinery and could so overburden the arbitration process as to prevent it from functioning successfully.

*Vaca*, 386 U.S. at 191.

The Court finds that the record evidence fails to establish that the Union breached its duty of fair representation either in its negotiation of the global settlement or in its representation of these two plaintiffs. The Union was faced with two consecutive and adverse arbitration decisions. The

-23-

first decision by Arbitrator Mittenthal (Snyder arbitration) found that Dow was justified in treating email offenses as "major offenses" under its progressive discipline policy and termination was warranted. The second arbitration decision by Arbitrator Zumas (Lesh arbitration) stated that the Mittenthal award was "authoritative" and "binding" on the instant case. The Union was faced with the option of arbitrating additional cases with near certain adverse outcomes, or negotiating the best arrangements for its members that would avoid or cushion the impact of termination for violating the email policy. *See Nida v. Plant Protection*, 7 F.3d 522 (6th Cir. 1993) (holding that a union's decision to settle a group grievance for cash instead of reinstatement was not arbitrary). The Union made a tactical decision to settle the cases and avoid future expenses while preserving some semblance of a bargaining position. There is no evidence that this course was pursued in bad faith.

Nor did the Union breach its duty of fair representation by informing Roper of the dangers of signing a last chance agreement. The undisputed evidence discloses that Local president William Laney explained the benefits and pitfalls of that option compared to the risk of pressing his grievance at arbitration, and that Roper then made his own decision. Even if the advice was not sound, a conclusion that itself is not apparent from the record, bad advice alone does not amount to bad faith, arbitrariness, or discrimination.

### III.

As noted above, the plaintiffs in these hybrid actions are required to establish their claims against both the employer and the union. In this case, the plaintiffs have done neither. The Court finds that there is no material fact dispute on whether Dow breached the CBA or the Union failed to properly represent the plaintiffs. Both defendants are entitled to summary judgment as a matter of law.

-24-

Accordingly, it is **ORDERED** that the motions by Dow Chemical Company for summary judgment [03-10202 dkt # 16, 03-10203 dkt # 15] are **GRANTED**.

It is further **ORDERED** that the motions by United Steelworkers of America and United Steelworkers of America Local 12075 for summary judgment [03-10202 dkt # 19, 03-10203 dkt # 18] are **GRANTED**.

It is further **ORDERED** that the plaintiffs' complaints are **DISMISSED WITH PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: March 31, 2006

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 31, 2006.

s/Tracy A. Jacobs
TRACY A. JACOBS

---